**Opinion issued September 1, 2020**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00941-CR

———————————

**QUINTON MALBROUGH, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 177th District Court**
**Harris County, Texas**
**Trial Court Case No. 1524524**

## O P I N I O N

A jury found appellant, Quinton Malbrough, guilty of the felony offense of directing the activities of a criminal street gang[1] and assessed his punishment at confinement for sixty years. In five issues, appellant contends that the evidence is

---

[1]    *See* TEX. PENAL CODE ANN. § 71.023(a), (b).

legally insufficient to support his conviction, he is entitled to a proper review of the factual sufficiency of the evidence, and the trial court erred in instructing the jury on the law of parties and in making a deadly-weapon finding in its written judgment.

We modify the trial court's judgment and affirm as modified.

## Background

Harris County Sheriff's Office ("HCSO") Sergeant B. Katrib testified that in spring 2015, he investigated a series of aggravated robberies involving cellular telephone stores in Harris County, Texas. The aggravated robberies that Katrib investigated included: (1) the March 18, 2015 aggravated robbery of a Cellular Sales cellular telephone store located at 9501 West Road in Harris County; (2) the April 3, 2015 aggravated robbery of a RadioShack electronics and cellular telephone store located at 5185 West 34th Street in Harris County; (3) the April 15, 2015 aggravated robbery of an A-Wireless cellular telephone store located at 15375 Wallisville Road in Harris County; (4) the April 26, 2015 aggravated robbery of an AT&T cellular telephone store located at 2123 Crosby Freeway in Harris County; and (5) the May 21, 2015 aggravated robbery of a Connectivity Source cellular telephone store located at 566 West FM 1960 in Harris County.

According to Sergeant Katrib, the March 18, 2015 aggravated robbery was reported at 7:57 p.m. The April 3, 2015 aggravated robbery was reported at 1:35 p.m. The April 15, 2015 aggravated robbery was reported at either 6:35 p.m.

2

or 6:49 p.m. The April 26, 2015 aggravated robbery was reported at 2:35 p.m. And the May 21, 2015 aggravated robbery was reported at 6:34 p.m. or 6:44 p.m. Appellant was involved with or linked to the aggravated robberies.

*March 18, 2015 Aggravated Robbery*

Cellular Sales is a retailer for Verizon Wireless. Robert Penny, a regional director for Cellular Sales, testified that on March 18, 2015, an aggravated robbery occurred at a Cellular Sales cellular telephone store located at 9501 West Road in Harris County. According to Penny, two individuals entered the store that evening, "robbed the people that were there," and took a large number of cellular telephones and devices from the store. One of the individuals participating in the aggravated robbery had a firearm. Two employees were working at the time.

When Penny arrived at the store after the robbery, the store's employees were very distressed and indicated that they had been scared during the robbery. One of the employees was "still shaking." Penny stated that the total value of the cellular telephones and devices that were taken during the aggravated robbery was about $60,000 or $70,000.

John Davis testified that, on the evening of March 18, 2015, he was at the Cellular Sales cellular telephone store when the store was "robbed at gunpoint." According to Davis, while he was talking with a sales associate in the store, two Black males entered. One "guy came up to [Davis and the sales associate that was

3

helping him] with something over his face and a hoodie and a gun pointed at [them]." The other male started "corralling" the other sales associate in the store and moving her toward Davis. The men said, "Take us to the phones, the room with the phones," and they began pushing Davis and the two sales associates toward the back of the store. When Davis and the two sales associates made it into the inventory room, the men "ask[ed] for all of the phones" and gave Davis and the sales associates a pillowcase to put the cellular telephones inside. The men knew that "one of the phones in the safe ha[d] [a] tracker in it" and so they asked Davis and the sales associates "not to give them the one with the tracker in it."[2] After the men had the cellular telephones, they told Davis and the sales associates to lie down on the ground and to not come out. Although the men tried to leave the store through a backdoor, when they were unable to, they left through the front door.

According to Davis, the men looked young, either in their "[l]ate 20s" or "early 30s." They seemed calm, comfortable, well-planned, and like it "wasn't their first time." Davis feared for his life, and one of the sales associates was "stricken with fear." Davis called for emergency assistance after the men left. Davis believed that the men took a lot of cellular telephones from the store.

---

[2]    A cellular telephone "with [a] tracker blends in with the others, but when [it is] picked up [it] activates and acts [as] a tracking device." *See Edwards v. State*, No. 14-17-00460-CR, 2019 WL 2426710, at *1 n.1 (Tex. App.—Houston [14th Dist.] June 11, 2019, pet. ref'd) (mem. op., not designated for publication).

4

A copy of a videotaped surveillance recording from the aggravated robbery as well as a copy of the audio recording of Davis's telephone call for emergency assistance were admitted into evidence at trial. A list of the cellular telephones and devices that were taken from the Cellular Sales store during the aggravated robbery was also admitted into evidence.

HCSO Deputy S. McWhirter testified that on March 18, 2015, while on patrol, he responded to a call for emergency assistance related to an aggravated robbery of a Cellular Sales cellular telephone store. While at the store, McWhirter was approached by an employee of the nearby Kroger grocery store who had seen two men fleeing in a car after the robbery. McWhirter was able to review a videotaped surveillance recording of the Kroger grocery store's loading dock, which showed a four-door silver Nissan Altima car waiting behind the store. That same car is visible on the videotaped surveillance recording from the Cellular Sales cellular telephone store before the aggravated robbery occurs.

Sergeant Katrib testified that the March 18, 2015 aggravated robbery was committed by Anthony Hill, Levonte Williams,[3] and Deondrick Mitchner.[4]

---

[3]    Sergeant Katrib testified that Williams is Mitchner's brother and Williams's nickname is "Pops" or "Big Pops."

[4]    Sergeant Katrib testified that Mitchner's nickname is "Doola."

5

*April 3, 2015 Aggravated Robbery*

Jose Plietez testified that on April 3, 2015, he was a store sales manager at a RadioShack electronics and cellular telephone store located at 5185 West 34th Street in Harris County. On April 3, 2015, while Plietez was working in the back room of the store—where the most expensive items like cellular telephones, tablets, and headphones were stored—an aggravated robbery occurred. Plietez first noticed on a monitor that there were three people around the front counter of the store and that one of his employees, a sales associate, had his hands up. Plietez pushed a panic button which sent an emergency alert to law enforcement officers. Plietez did not attempt to forcefully close the safe that, at the time, was open in the store's back room, because he was afraid that he or the sales associate would be retaliated against.

According to Plietez, the three individuals committing the aggravated robbery came into the back room where Plietez was and they asked for the cellular telephones and other devices. They instructed Plietez to put the cellular phones and devices into a bag and told him to "make sure not to put a tracker inside of . . . the bag." The three individuals took most of the safe's contents. One of the individuals also took Plietez out to the front of the store and told him to "[p]ut all of the money that was in the [cash] register . . . in the bag." When the three individuals left, they "t[ook] off to the back" of the store. Plietez and the sales associate secured the store's entrances and exits and called for emergency assistance.

Plietez testified that during the aggravated robbery he feared for his life and he was afraid for his safety and the safety of the sales associate. He estimated that the three individuals took about $200 from the cash register and about $20,000 worth of cellular telephones and devices from the store.

A copy of a videotaped surveillance recording from the aggravated robbery was admitted into evidence at trial.

Houston Police Department ("HPD") Officer E. Gutierrez testified that on April 3, 2015, while on patrol, he responded to a call for emergency assistance at the RadioShack electronics and cellular telephone store. Upon arrival at the store, Gutierrez learned that the individuals who had committed the aggravated robbery fled in a tan four-door car.

### April 15, 2015 Aggravated Robbery

A-Wireless is a retailer for Verizon Wireless. Darell Jerome Miles, Jr. testified that on April 15, 2015, he was working as a sales associate at an A-Wireless cellular telephone store located at 15375 Wallisville Road in Harris County. On that day, two Black males wearing black masks entered into the store and "began to rob" it. The men had a firearm. Miles went to the cash register and then got on the ground. Eventually, one of the individuals wearing a black hoodie came and got Miles and two female customers and brought them to the back of the store where the safe was located. The men then told Miles to fill a "bed sheet" or tablecloth with

7

cellular telephones and devices, and Miles did so.  The men stole a large amount of cellular telephones and devices with a high retail value from the store's safe.

Miles testified that he was afraid that the men committing the aggravated robbery would shoot him if he did not cooperate with the robbery.  And Miles stated that "anytime someone put[s] a gun in your face, you don't know what they're going to do."  Miles called for emergency assistance after the men left the store.  According to Miles, the two men who robbed the store took steps to conceal their identities and the men broke two customers' cellular telephones during the robbery,  A woman outside of the store told Miles that the men got into a car and "t[ook] off."

A copy of a videotaped surveillance recording from the aggravated robbery as well as a copy of the audio recording of Miles's telephone call for emergency assistance were admitted into evidence at trial.

HCSO Deputy B. Mills testified that on April 15, 2015, while on patrol, he responded to a call for emergency assistance at an A-Wireless cellular telephone store related to an aggravated robbery.  Upon arrival, several employees and several witnesses told Mills that they had been "robbed at gunpoint" and that the two individuals—Black males wearing masks and carrying a large bag—who had committed the aggravated robbery—fled from the store in a silver Dodge Caravan car with a certain license plate number.  When Mills "r[an] the license plate [number]," he received information that the car had been stolen.  The car was later

8

found in a residential area about a mile away from the A-Wireless cellular telephone store. According to Mills, the total value of the cellular telephones and devices taken from the store was about $51,205.

Sergeant Katrib testified that the silver Dodge Caravan car that had been used to commit the aggravated robbery was later found abandoned in a field in a nearby residential area. A copy of a videotaped surveillance recording from a house in the residential area was admitted into evidence at trial, and it shows a silver Buick car, driven by a third person, in the area near where the silver Dodge Caravan car was abandoned. The recording also shows the individuals who committed the aggravated robbery getting into the silver Buick car after they abandoned the silver Dodge Caravan car and fleeing the area. Katrib described the silver Buick car as a "pick-up vehicle or [a] second getaway vehicle."[5] The Buick car belonged to an individual named George Randall.

### April 26, 2015 Aggravated Robbery

Brandon Nolen testified that on April 26, 2015, he was working as a sales associate at an AT&T cellular telephone store located at 2123 Crosby Freeway in Harris County, when two Black males and one Black female, wearing masks and carrying firearms, came into the store. The three individuals threw him and two

---

[5] Sergeant Katrib explained that the use of "a stolen vehicle and a safe vehicle" was a common theme in the aggravated robberies involved in this case.

9

customers on the ground, and they broke the customers' cellular telephones. The three individuals then took Nolen and the two customers to the back of the store where the safe was located. The two customers were placed in the corner, and Nolen was forced to open the safe. The three individuals gave Nolen a bag and told him to "fill it up" with cellular telephones and devices. They pushed their firearms into his back and threatened him.

According to Nolen, a "tracker phone" made it into the bag.[6] The three individuals took a large number of cellular telephones and devices, ordered Nolen and the customers not to move, and left the store through the front door. Nolen called for emergency assistance.

A copy of a videotaped surveillance recording from the aggravated robbery as well as a copy of the audio recording of Nolen's telephone call for emergency assistance were admitted into evidence at trial. A list of the cellular telephones and devices that were taken during the robbery was also admitted into evidence.

Raymond Polka testified that on April 26, 2015, he and his nephew, Dalton Grosshart, were at an AT&T cellular telephone store located at 2123 Crosby Freeway when "three people came in and robbed the store." According to Polka,

---

[6]     Nolen testified that a "tracker phone" is "a phone that sits in the back of the safe" that "blends in with all the other phones." Once it is removed from "whatever it's on, it sets off an alarm and triggers silently." It alerts law enforcement officers and the store's manager.

two Black males and one Black female entered the store. The three individuals were wearing hoodies and masks, and the woman was also wearing gloves. The three individuals told everyone in the store "to get down." They took Polka's cellular telephone and smashed it. They then took Polka, Grosshart, and the sales associate into the store's back room. Polka and Grosshart were placed in the corner and told to crouch down, and the sales associate opened the safe. The three individuals took the contents of the safe and left the store.

Grosshart testified that on April 26, 2015, he and Polka "were held at gunpoint with an employee in [an] AT&T store." According to Grosshart, he was at the store to get a cellular telephone when three individuals—two males and one female—"rushed around the corner" and "c[ame] into the store wearing all black [with] their faces covered." When the three individuals came in, they yelled for everyone to "get on the ground." At least two of the individuals had firearms. They had Grosshart, Polka, and the sales associate go to the back room of the store where the safe was located. Grosshart and Polka were placed in a corner of the back room and their cellular telephones were broken by "[t]he bigger guy." One of three individuals, a "smaller guy" with a firearm, told the sales associate to open the safe and put all the cellular telephones and devices into a bag. He pressed the firearm against the sales associate's back and told him to "[h]urry up." The three individuals ran out the front

11

door of the store when they were done. Grosshart believed at the time that he would be shot if he did not listen to the three individuals, and he feared for his life.

HCSO Deputy J. Palermo testified that while on patrol on April 26, 2015, he responded to a call involving an aggravated robbery of an AT&T cellular telephone store located at 2123 Crosby Freeway. At the time, the individuals who had committed the robbery were fleeing in a gray Pontiac car while being tracked by law enforcement officers using a global positioning system ("GPS").

While responding to the call, Palermo located the gray Pontiac car and attempted to initiate a traffic stop, but the individuals continued to flee in the car. When the car finally stopped, three of the four individuals in the car fled on foot; the driver remained with the car. After the driver was arrested, Palermo "clear[ed]" the car to make sure that no one else was inside. Palermo found boxes of cellular telephones and a firearm inside the car—items, according to Palermo, that were consistent with a person having committed the offense of aggravated robbery. The three individuals that fled on foot were later found by law enforcement officers.

HCSO Deputy A. Alvarado testified that on April 26, 2015, while on patrol, he responded to a call regarding an aggravated robbery of an AT&T cellular telephone store located at 2123 Crosby Freeway. He explained that law enforcement officers were using  a "Bloodhound system" or a "GPS tracker that [was] put in during [the] robbery" to locate the individuals who had committed the aggravated

12

robbery. When Alvarado spoke to the employee and customers who were inside the store during the aggravated robbery, they stated that "they had just been robbed at gunpoint" and that the individuals involved in the robbery had "stole[n] things from the safe in the back room." Alvarado noted that at least one of the witnesses' cellular telephones had been broken during the robbery.

Alvarado further testified that a large amount of cellular telephones still in their original packaging were later recovered from the Pontiac car that had been used to flee after the aggravated robbery. The car also contained firearms[7] and cash. Mitchner—one of the three people who had fled on foot—was found and detained by law enforcement officers that same day.

Harris County Constable's Office ("HCCO"), Precinct 3, Deputy J. Wilson testified that on April 26, 2015, he assisted in searching for the individuals who had committed the aggravated robbery of a cellular telephone store. He found and detained Williams, who had fled on foot.

Sergeant Katrib testified that James Philpot was the driver of the gray Pontiac car involved in the April 26, 2015 aggravated robbery and that Mitchner, Williams, and Jaimi Hawkins committed the April 26, 2015 aggravated robbery.[8] Philpot,

---

[7] Sergeant Katrib testified that he was able to connect one of the firearms found in the Pontiac car to the March 18, 2015 aggravated robbery of the Cellular Sales cellular telephone store.

[8] Hawkins testified that she participated in the April 26, 2015 aggravated robbery of the AT&T cellular telephone store located at 2123 Crosby Freeway. She stated that

13

Mitchner, and Williams were all located and arrested on the day of the aggravated robbery.

Sergeant Katrib noted that the April 15, 2015 and April 26, 2015 aggravated robberies had similarities, including that during both aggravated robberies customers' cellular telephones were smashed on the ground and rendered inoperable, employees and customers were taken to the back of the stores, similar clothing was worn by one person involved in both robberies, and both robberies involved a "violent takedown of the stores." Katrib stated that an individual named Terrence Edwards had organized the April 26, 2015 aggravated robbery.

*May 21, 2015 Aggravated Robbery*

Connectivity Source is a Sprint retailer. Matthew Major testified that he is the director of field operations for Connectivity Source. According to Major, on May 21, 2015, an aggravated robbery occurred at a Connectivity Source cellular telephone store located at 566 West FM 1960 in Harris County. Major was notified of the robbery when a "GPS tracker that [was] inside of an iPhone box" was removed from the store's safe. When the tracker sent him an alert, he was able to view the surveillance camera system for the store, and he saw that there was an active robbery in progress. Although law enforcement officers would have been notified when the

after leaving the store, she, Mitchner, and Williams got into a black car and then switched and got into the Pontiac car about a mile down the street from the AT&T cellular telephone store.

14

tracker was removed from the safe, Major also called for emergency assistance. When Major arrived at the store after the aggravated robbery, the store's employees were "emotionally shooken [sic] up" due to having "a gun stuck to [their] head[s]."

Jose Barrera testified that on May 21, 2015, he was working as a sales associate at a cellular telephone store located at 566 West FM 1960 when an aggravated robbery occurred. Barrera stated that he saw a car approach the store and two males wearing masks came into the store. One of the men had a firearm. They told Barrera to get on his knees and then took him, a customer, and another employee to the back room of the store where the safe was kept. The men told them to "hurry up" and to "put as many [phones] as they could" in a bag. And the men stated that they did not want a "tracker phone." Another employee removed the cellular telephones and devices from the store's safe, and the two men ended up taking a "tracker phone." A call for emergency assistance was made after the men left the store. Barrera testified that he was afraid that the two men would shoot him if he resisted.

A copy of a videotaped surveillance recording from the aggravated robbery was admitted into evidence at trial. Additionally, a copy of a videotaped surveillance recording from a Chili's restaurant located next to the Connectivity Source cellular telephone store was admitted into evidence. A list of the cellular telephones and devices that were taken from the Connectivity Source cellular telephone store during

the aggravated robbery was also admitted into evidence. The total value of the cellular telephones and devices taken from the store during the robbery was about $29,257.70.

HCSO Deputy T. Bullard testified that while on patrol on May 21, 2015, he responded to a call involving an aggravated robbery. Bullard initially responded to the Chili's restaurant located next to a Connectivity Source cellular telephone store at 566 West FM 1960. Bullard was notified by a witness inside the restaurant that the aggravated robbery was occurring at the nearby cellular telephone store. Bullard saw the individuals committing the aggravated robbery fleeing the cellular telephone store after the robbery in a four-door, silver car. Bullard further testified that while he was in the parking lot of the Chili's restaurant, he saw a gold Mercedes Benz car with two Black males in the front seats.

While viewing the videotaped surveillance recording from the Connectivity Source cellular telephone store at trial, Deputy Bullard noted that the same gold Mercedes Benz car that he saw in the parking lot of the Chili's restaurant can be seen in the recording and that the parking spot where the car was located during the aggravated robbery had a "good view" of the cellular telephone store. Bullard further explained that after the individuals committing the aggravated robbery left the store in their silver car, the gold Mercedes Benz car immediately pulled out of its parking spot.

16

HCSO Deputy D. Wilkie testified that while on patrol on May 21, 2015, he responded to a call for emergency assistance involving an aggravated robbery of a Connectivity Source cellular telephone store located at 566 West FM 1960. At the time, Wilkie assisted in locating the car, a silver Mercury, that the individuals who had committed the aggravated robbery were using to flee. Another law enforcement officer initially located the car and attempted to initiate a traffic stop, but the car continued to flee. Wilkie then found the car. Eventually, the driver of the car damaged the vehicle and crashed it at the end of a dead-end street. The driver stayed with the car, but two individuals got out of the car and fled on foot. Wilkie detained the driver—an individual named Antoine Duplechin-Holden.

HCSO Sergeant J. Mabry testified that while on patrol on May 21, 2015, he responded to a call for emergency assistance related to an aggravated robbery of a Connectivity Source cellular telephone store located at 566 West FM 1960. Mabry assisted in coordinating law enforcement efforts after the silver Mercury Grand Marquis car, which the individuals who had committed the aggravated robbery were using, crashed at the end of a dead-end street. Mabry explained that the driver of the car was detained, but law enforcement officers had to find the two individuals who had fled on foot after the car crash. Mabry inventoried the items in the Mercury Grand Marquis car and found about forty cellular telephones in boxes, ski masks, gloves, and Duplechin-Holden's driver's license and other identification.

17

HCCO, Precinct 4, Deputy J. Glaze testified that on May 21, 2015, he assisted in the search for individuals involved in an aggravated robbery. According to Glaze, the car that the individuals who committed the aggravated robbery used crashed and two individuals got out of the car and fled on foot. Glaze, with his K-9 unit, became involved in the search for the two fleeing individuals. The individuals were seen fleeing toward the backyards of houses in the area. Glaze ultimately found Randall and a second individual in a shed in the backyard of a house.

Sergeant Katrib testified that Randall, Duplechin-Holden, and an individual named Christin Criswell committed the May 21, 2015 aggravated robbery of the Connectivity Source cellular telephone store. They were arrested and interviewed by Katrib. Criswell admitted to Katrib that he had also committed the April 15, 2015 aggravated robbery of the A-Wireless cellular telephone store.

In regard to appellant's role in the May 21, 2015 aggravated robbery, Sergeant Katrib explained that appellant and Edwards engaged in planning and counter-surveillance for the robbery. They also "g[ave] the orders and directions to the individuals to commit the aggravated robbery while [they] ke[pt] a watch from" appellant's car, which had "a direct vision to the [cellular telephone] store to look out for any law enforcement." Appellant's gold Mercedes Benz car was in the parking lot of the Chili's restaurant's next to the Connectivity Source cellular telephone store during the aggravated robbery. And appellant conducted

18

surveillance from his car before the aggravated robbery occurred. Katrib also explained that appellant and Edwards gave orders to Randall, Duplechin-Holden, and Criswell—the individuals who committed the aggravated robbery of the Connectivity Source cellular telephone store.

*Anthony Hill*

Hill testified that he pleaded guilty to committing the March 18, 2015 aggravated robbery of the Cellular Sales cellular telephone store located at 9501 West Road and to committing the April 3, 2015 aggravated robbery of the RadioShack electronics and cellular telephone store located at 5185 West 34th Street. Hill further testified that he had a close relationship with Edwards and appellant.[9] Edwards and appellant had a close relationship, and they were together "all the time."

In regard to the March 18, 2015 aggravated robbery of the Cellular Sales cellular telephone store, Hill stated that he was originally contacted by Randy Sullivan, an individual he knew from school, and told to come to Sullivan's house on March 18, 2015. Sullivan asked Hill if he wanted to participate in a robbery and said that Hill would be the driver. Sullivan explained that two other individuals would "go in, . . . get what they needed to get, and come out and come back to the

---

[9]     Hill testified that Edwards's nickname is "T Streets" and appellant's nickname is "Quinn Quinn."

19

house." Appellant and Edwards were at Sullivan's house for this conversation. Hill drove his car, a Nissan Altima, with two other individuals inside, and he followed behind Edwards and appellant, who were in Edward's car, a Buick, to the cellular telephone store where the robbery was going to be committed. Hill did not know beforehand where he was driving. Edwards and appellant were present for the robbery, and Hill communicated with them via speakerphone while the aggravated robbery was taking place. Hill called Edwards's cellular telephone, and Edwards told him "everything that was going on" while the robbery was occurring. Although Hill did not know where Edwards and appellant had parked Edwards's car during the aggravated robbery, he stated that they had to be someplace where they could see the Cellular Sales cellular telephone store.

Hill further testified that Williams and Mitchner[10] were the two individuals he drove to the Cellular Sales cellular telephone store on March 18, 2015. He dropped them off, and they went into the store to commit the aggravated robbery while Hill waited in his car near the back of the store. Hill did not know whether they had a firearm when they went into the store.

Eventually, Williams and Mitchner returned to Hill's car with a large bag of cellular telephones. Hill knew when Williams and Mitchner were headed back to

---

[10] According to Hill, Williams's nickname is "Pop" and Mitchner's nickname is "Doola."

his car after the robbery because Edwards told him when they were speaking on their cellular telephones. After the robbery, Hill drove everyone to "Greenspoint" to exchange the cellular telephones that had been taken during the robbery. At Greenspoint, Williams and Mitchner got out of Hill's car, and they took with them the cellular telephones that were taken from the store. Williams and Mitchner went over to Edwards's car, but Hill did not know to whom the cellular telephones were given. Hill did not see the cellular telephones again.

Later, Hill returned to Sullivan's house, and Edwards and appellant also returned to the house. Edwards and appellant paid Hill, Williams, and Mitchner. Hill received $750 for participating in the aggravated robbery.

According to Hill, Edwards was the only person "that cashed out the phones" that were taken during March 18, 2015 aggravated robbery of the Cellular Sales cellular telephone store. And it was Edwards who told Williams and Mitchner to watch out for "tracker phones."

In regard to the April 3, 2015 aggravated robbery of the RadioShack electronics and cellular telephone store, Hill testified that he, Williams, Criswell, and Randall participated in that robbery. Hill became involved in the April 3, 2015 aggravated robbery after Edwards called him and asked if he "want[ed] to make some more money like [he] did the first time." Hill met the individuals participating in the robbery at the Pines of Woodforest apartments where appellant lived. Hill

21

again followed Edwards's car, the Buick, to the RadioShack electronics and cellular telephone store because he did not know where the robbery was going to take place. Edwards and appellant just told Hill to follow them in Edwards's car.

Hill waited in his car at a nearby hotel while Williams, Criswell, and Randall went into the store. Hill did not know who had carried a firearm into the store during the robbery. While Hill waited, he was in contact with Edwards and appellant on speakerphone, and they told Hill what was happening while the robbery was occurring. After the robbery, Hill drove Williams, Criswell, and Randall back to the apartments where appellant lived and exchanged the cellular telephones from the robbery while inside appellant's apartment. According to Hill, while inside the apartment, they "all pulled out the phones to see what kind [they] had" and everyone laughed and said at the same time: "These some cheap phones." Edwards paid Hill about $300 for participating in the April 3, 2015 aggravated robbery. He was paid less for this robbery because of the quality of the cellular telephones that were taken from the RadioShack electronics and cellular telephone store. Hill later told Edwards that he no longer wanted to participate in any robberies.

On cross-examination, when asked whether appellant had ever "supervise[d], direct[ed], or finance[d] any robberies," Hill stated that to his knowledge, appellant had not. But Hill also noted that Edwards never used appellant's cellular telephone to communicate.

22

*Deondrick Mitchner*

Mitchner testified that he committed the March 18, 2015 aggravated robbery of the Cellular Sales cellular telephone store located at 9501 West Road and the April 26, 2015 aggravated robbery of the AT&T cellular telephone store located at 2123 Crosby Freeway. Mitchner became involved with these robberies because of his brother, Williams. According to Mitchner, before the March 18, 2015 aggravated robbery, Williams came home with "some money" and Mitchner asked Williams where it had come from. After Williams explained to Mitchner that he had been participating in robberies, Williams asked Mitchner if he wanted to participate as well.

On March 18, 2015, Mitchner went with Williams to the Timberwoods Condominiums (the "Condos") to discuss the robbery. At the Condos, Mitchner met appellant and Edwards.[11] Mitchner talked to appellant and Edwards briefly, and they told Mitchner to "get in and out." After the Condos, the group left to go commit the robbery, and at that point, Mitchner did not know where they were going. Hill, who Mitchner did not know at the time, drove Mitchner and Williams to the robbery location. Mitchner found a firearm in Hill's car, which he assumed was to be used in the robbery. Mitchner took the firearm into the cellular telephone store to commit

---

[11] Mitchner testified that appellant's nickname is "Quinn" and Edwards's nickname is "T Streets."

23

the robbery. According to Mitchner, he and Williams waited in Hill's car for about six minutes before they went inside the store, and during that time, Hill was talking on his cellular telephone. Mitchner overheard someone on Hill's cellular telephone ask, "Y'all good, like [a]re y'all going to do it? Can y'all do it right now?" And Mitchner responded, "[y]eah" to that person. He and Williams then got out of Hill's car and went inside the store to commit the robbery.

After the robbery, Mitchner and Williams ran out of the store and around to the back where Hill had parked his car. Mitchner stated that he and Williams took a large number of cellular telephones from the store. After the aggravated robbery, appellant and Edwards were supposed to sell the cellular telephones. Mitchner was paid by Edwards, or appellant, or both, about $800 or $900 later that night for his participation in the aggravated robbery. Edwards and appellant took Mitchner home after the robbery. Mitchner stated that he, Williams, Hill, Edwards, and appellant participated in the March 18, 2015 aggravated robbery of the Cellular Sales cellular telephone store.[12]

---

[12] In regard to the March 18, 2015 aggravated robbery, Mitchner summarized his testimony, stating that Williams took him to the Condos where he met Edwards and appellant; he got in a car that was already at the Condos; the car had a firearm inside waiting for him; he discussed with Williams who would carry the firearm; the car drove Mitchner to a location that had been preselected; Mitchner committed a robbery; and Mitchner was paid by either Edwards or appellant or both afterwards.

24

In regard to the April 26, 2015 aggravated robbery of an AT&T cellular telephone store, Mitchner testified that Williams received a telephone call and then spoke to Mitchner about the robbery. This time, Mitchner and Williams went to a house located at 102 Black Walnut Drive near a Wal-Mart store and waited. James Philpot, the driver, came and picked Mitchner and Williams up from the house in a Pontiac car, and he drove them to the AT&T cellular telephone store. Mitchner stated that another car, a Buick, also went to the same store.

Mitchner testified that he, Williams, and Hawkins committed the April 26, 2015 aggravated robbery of the AT&T cellular telephone store. And before entering the store, they waited in Philpot's car for about ten or fifteen minutes so that there would be fewer customers inside of the store. Both Mitchner and Williams carried firearms during the robbery, and Mitchner believed that he used the same firearm that he used during the March 18, 2015 aggravated robbery. The firearms that they used during the commission of the robbery were inside Philpot's car. Mitchner knew that he would be paid for his participation in the aggravated robbery and that the cellular telephones that they would take from the store would be sold in bulk afterwards.

Mitchner also testified that Williams, his brother, had participated in the April 15, 2015 aggravated robbery, and Mitchner identified Williams on the videotaped

25

surveillance recording from the April 15, 2015 aggravated robbery of the A-Wireless cellular telephone store located at 15375 Wallisville Road.

On cross-examination, Mitchner testified that Williams introduced him to Edwards, Edwards "gave [him] the rundown of what to do," Edwards told him about "tracker phones," Edwards picked the location to exchange the cellular telephones that were taken from the stores, and Edwards paid him. Mitchner stated that appellant did not give Mitchner any orders.

### Antoine Duplechin-Holden

Duplechin-Holden testified that he, Randall,[13] and Criswell[14] participated in the May 21, 2015 aggravated robbery of the Connectivity Source cellular telephone store. At the time, Duplechin-Holden needed money after he lost his job, and Randall, his friend, appeared to have "a lot of money." Duplechin-Holden learned that Randall had been committing aggravated robberies and decided that he wanted to participate with him. In April 2015, Randall took Duplechin-Holden to the Condos, where he met appellant and "a few other guys."

The first time that Duplechin-Holden went with Randall to the Condos, he stayed in the car most of the time, but Randall stood outside the car and talked with

---

[13]    According to Duplechin-Holden, Randall's nickname is "Pookie."

[14]    Duplechin-Holden testified that Randall and Criswell were friends from school.

appellant and Edwards.[15]  There were about twelve people outside the Condos with ages ranging from fourteen years old to the late twenties.  Duplechin-Holden met both appellant and Edwards that day.  Duplechin-Holden talked to them and shook their hands.  Later, Randall explained who "T Streets was, who [appellant] was, and a couple of other young guys."  According to Duplechin-Holden, his trip to the Condos with Randall was the "first step into a group of people that was organized to commit aggravated robberies."

The second time that Duplechin-Holden went to the Condos he sat in the car and did not speak to anyone.  Duplechin-Holden stated that he and Randall were "just riding" and "went over there."

The third time that Duplechin-Holden went to the Condos, he was with Randall and Criswell.  And during that visit, he had a conversation with appellant inside appellant's car—a Mercedes Benz.  At first, Randall and appellant were having their own conversation and then Randall introduced Duplechin-Holden to appellant.  Appellant asked Duplechin-Holden who he was, if he did in fact attend college, and whether he was "sure [that he] want[ed] to get involved."  Appellant told Randall that he would "let [Randall] know when something . . . pop up pretty soon," meaning that appellant would tell Randall when a target for an aggravated robbery had been determined.

---

[15]     Duplechin-Holden testified that Edwards's nickname is "T Streets."

The fourth time that Duplechin-Holden went to the Condos was on May 20, 2015—the day before the May 21, 2015 aggravated robbery.  At the time, there were a lot of people and activity at the Condos, and Edwards was "probably the main person to be around."   After about twenty minutes of being there, Randall, Duplechin-Holden, and Criswell went to the side to discuss the aggravated robbery the next day.

At that time, appellant discussed with Randall, Duplechin-Holden, and Criswell "how the day would go after [they] received the tink."[16]  Appellant told them that that the next day he and Edwards would have a "tink" for Randall, Duplechin-Holden, and Criswell to use and to "answer the phone when [they] call[ed]."  He also explained that during the aggravated robbery two of them would go inside the store and one person would drive.  The driver would drop off the two individuals at the store and then "wait until they're finished[] [and] come right back."  Appellant also said that he and Edwards would be "parked somewhere real close [to] keep[] an eye on what's going on, as well [as] keep[] an eye out [to] let[] [them] know when to commit the crime."   In other words, appellant told Randall, Duplechin-Holden, and Criswell that he and Edwards would be nearby when the robbery was being committed, would watch the robbery, and they would tell

---

[16]     Duplechin-Holden testified that a "tink" was a "stolen car used when [someone is] committing a crime."

Randall, Duplechin-Holden, and Criswell when to go into the store and when to come out.

Appellant and Edwards also instructed Randall, Duplechin-Holden, and Criswell to "grab the phones" while inside the store and that, if they were "able to get in the safe in the back room," to "try to grab as much as [they] c[ould] and to get out quick." Appellant emphasized that the robbery should take three to five minutes at the most and that it should not be "a long process." Appellant also told Randall, Duplechin-Holden, and Criswell about the potential for a "tracker phone[]" or "tracking devices" and to "look out for trackers." When asked whether appellant "communicate[d] . . . [the] specifics and sort of tactics about how the[] robber[y] would and should be committed," Duplechin-Holden stated: "He did the day before, yes."

In regard to additional plans for the aggravated robbery, Duplechin-Holden testified that, before the robbery, he, Randall, and Criswell decided that Randall would be the driver and Duplechin-Holden and Criswell would go inside the store. Criswell was going to carry the firearm. On May 20, 2015, Randall told Duplechin-Holden via text message that a "[p]hone store" would be the target for the aggravated robbery. And the initial plan for the robbery was for Randall, Duplechin-Holden, and Criswell "to use a tink to go to the robbery" and also to park one of their own cars nearby. After the robbery, they would switch cars and "drive

29

off." And they would return to the Condos to give "the merchandise" or the cellular telephones from the store to appellant and Edwards.

Both appellant and Edwards explained to Randall, Duplechin-Holden, and Criswell the reason for using a stolen car and a "safe car." And although appellant and Edwards did not give "full details" on what they were going to do with the cellular telephones after the robbery, they did state that they would be "taking the phones to whoever they connect, or plug, or whoever their person they knew was to receive money for the phones[,] [l]ike, a transaction." It was Duplechin-Holden's impression that if he did his part then he would receive his "cut" after the robbery was completed. When asked at trial who had come up with the plan for the aggravated robbery, Duplechin-Holden stated that both appellant and Edwards had.

On May 21, 2015—the day of the robbery—Randall drove Duplechin-Holden's car over to appellant's apartment. Duplechin-Holden's car, a Mercury Grand Marquis, was going to be used as the "safe car" for the robbery and "paper tags" were put on his car. Appellant and Edwards then arrived in their own car, and another individual "pulled up in the tink"—a Dodge Durango sport utility vehicle. Randall, Duplechin-Holden, and Criswell picked up the "tink" from appellant and Edwards at the appellant's apartment. They were told by appellant and Edwards to go ahead and go over to the area of town where the robbery was going to be committed and to "wait for [their] cue" because appellant and Edwards

30

were going to instruct Duplechin-Holden and Criswell when to actually enter the cellular telephone store and "start the robbery."

Duplechin-Holden explained that he began driving the "tink" toward the robbery location, while Randall followed behind him in Duplechin-Holden's car with Criswell. But the "tink" stopped working on the drive. Duplechin-Holden then left the "tink," after wiping it down, and got in his own car with Randall and Criswell. Duplechin-Holden decided to just use his own car during the robbery. When they arrived at the cellular telephone store, they parked across the street and waited for about twenty or thirty minutes "for [a] call to let [them] know to go" or "to . . . drive to the venue or the [cellular telephone] store." While waiting, Randall spoke to appellant and Edwards on his cellular telephone. Edwards and appellant were parked in appellant's car, a Mercedes Benz, in the parking lot of the cellular telephone store near a Chili's restaurant.[17] Appellant and Edwards said things like "[h]old on," "[a] lady inside," "[s]omeone's in there," and "[w]ait." Appellant was the person who was mostly giving Randall the play-by-play and status updates over the telephone.

Duplechin-Holden further testified that the first time that Randall actually drove over to the cellular telephone store he did not stop because appellant and

---

[17]    At trial, Duplechin-Holden identified appellant's car in the parking lot on the videotaped surveillance recording from the AT&T cellular telephone store.

31

Edwards saw someone go inside the store. And they told Randall to "go around" and to "come back around." When Randall returned to the store for the second time, Randall dropped Duplechin-Holden and Criswell off near the side of the AT&T cellular telephone store and they ran inside. Both Duplechin-Holden and Criswell were wearing masks and gloves.[18] Once they were inside the store, they told the employees to put the cellular telephones in the bag and to stay calm. During the robbery, Duplechin-Holden and Criswell were on the telephone with Edwards so that appellant and Edwards could hear what was happening in the store and so that they could alert Duplechin-Holden and Criswell to anything that was happening outside the store. Duplechin-Holden explained that it appeared that someone told Randall when to come back to the store to pick up Duplechin-Holden and Criswell. Appellant's car drove off from the parking lot after Randall, Duplechin-Holden, and Criswell left in Duplechin-Holden's car.

While riding in Duplechin-Holden's car after the robbery, Duplechin-Holden stated that he and Criswell were checking for "tracker phones" and throwing them out of the car. At some point, law enforcement officers began to follow Duplechin-Holden's car. Randall spoke to appellant while they were fleeing from

---

[18]     Duplechin-Holden noted that he and Criswell used their own masks and gloves that they purchased from a store.

32

law enforcement officers, and appellant told Randall that if they "g[o]t away" then to "holler" at him and he would come pick them up.

While fleeing from law enforcement officers, Duplechin-Holden and Criswell threw a firearm and "clip" out of the car as well as some cellular telephones and devices that did not appear to be very valuable. Eventually, the tires on Duplechin-Holden's car blew out, and the car stopped at the end of a dead-end street. Duplechin-Holden stayed with the car, but Randall and Criswell fled on foot. Law enforcement officers later located Randall and Criswell.

According to Duplechin-Holden, the firearm that was used in the May 21, 2015 aggravated robbery of the AT&T cellular telephone store came from a house located at 102 Black Walnut Drive near a Wal-Mart store. On May 10 or May 11, 2020, Randall, Duplechin-Holden, and Criswell followed Edwards over to the house. Edwards went inside the house, and Randall, Duplechin-Holden, and Criswell remained outside in their car. Edwards came back out with a black backpack and gave it to Randall, Duplechin-Holden, and Criswell. Inside of the backpack were two firearms.[19] Duplechin-Holden explained that sometimes firearms are referred to as "burner[s]," like "throw-away pistol[s]," in conversations. Criswell kept the firearms until the May 21, 2015 aggravated robbery, and he carried a firearm during

_____

[19] Duplechin-Holden identified the firearms as the ones recovered by law enforcement officers after the May 21, 2015 aggravated robbery.

33

the robbery. When asked at trial who supplied the firearms for the May 21, 2015 aggravated robbery, Duplechin-Holden stated that Edwards had.

Duplechin-Holden also testified that Randall is appellant's cousin. And Randall told Duplechin-Holden that appellant and Edwards were "the overseers of the whole situation, . . . the whole lick or robbery."[20] Appellant and Edwards would "ch[o]ose . . . the guys that would go in the store, grab and go." Randall was paid in cash for his participation in certain robberies, and before May 21, 2015, he had been "the driver" during another aggravated robbery. Randall had explained to Duplechin-Holden that after each robbery was complete, "the proceeds" were delivered to appellant and Edwards, and they paid Randall.

Duplechin-Holden described appellant and Edwards as people that "everyone was drawn to" and stated that they were popular in the community because "[t]hey were the guys that were setting up the licks" or robberies. Appellant was more outspoken when Edwards was not around.

### Ali Riaz

Ali Riaz testified that between March 2015 and June 2015, he worked at a cellular telephone store located at TX-249 and Bammel-North Houston Road. At the store, among other things, he bought used or new phones to resell. Riaz stated that he bought certain cellular telephones from Edwards between March 2015 and

---

[20] Duplechin-Holden stated that a "lick" is a robbery.

June 2015 that he knew were stolen. According to Riaz, Edwards initially started selling him small amounts of cellular telephones, but the number of cellular telephones increased over time. During one large transaction, Edwards sold Riaz thirty cellular telephones. Edwards would call Riaz and ask him how much he could offer for a particular cellular telephone, and if they agreed on a price, then Edwards would come into the store and sell Riaz the phone. Edwards contacted Riaz at least once a week to see if Riaz could purchase any cellular telephones. Riaz estimated that, in total, during March 2015 and June 2015, Edwards received about $45,000 or $50,000 from Riaz related to sales of cellular telephones. Riaz believed that the cellular telephones that he received from Edwards would be sold overseas. Riaz stated that he had never seen appellant before and did not conduct any transactions with appellant.

***Cellular Telephone Communication Evidence***

Houston Police Department ("HPD") Officer J. Taylor testified that he is a member of the communications intelligence unit in the criminal intelligence division of the HPD, and he analyzed historical cellular telephone records related to certain aggravated robberies of cellular telephone stores in 2015.

In regard to the March 18, 2015 aggravated robbery, which was reported at about 7:57 p.m., Taylor examined telephone calls that occurred between 7:30 p.m. and 7:45 p.m. According to Taylor, appellant's cellular telephone utilized a cellular

35

telephone tower near the robbery location at 7:30 p.m. The call involving appellant's cellular telephone lasted about six minutes, and it occurred before any call for emergency assistance was made about the aggravated robbery.[21]

In regard to the April 3, 2015 aggravated robbery, which was reported at about 1:35 p.m., Taylor determined that a telephone call between Edwards's cellular telephone and Hill's cellular telephone occurred near the time of that robbery. The call lasted about thirty-three seconds. A telephone call also occurred between appellant's cellular telephone and Williams's cellular telephone near the time of the aggravated robbery. Appellant's cellular telephone called Williams's cellular telephone and the call lasted about twenty minutes. The code *67 was used on appellant's cellular telephone to try and "obfuscate [the] number from the caller ID of the person that [it was] calling." Both the telephone call between Edwards and Hill, and the telephone call between appellant and Williams, utilized a cellular telephone tower near the robbery location.

Taylor also testified that immediately after the robbery was reported to law enforcement officers, Edwards's cellular telephone called Riaz's cellular telephone about nine times in ninety-minutes. Further, telephone calls between Edwards's cellular telephone and appellant's cellular telephone occurred after the robbery, and

---

[21] Sergeant Katrib similarly testified that on March 18, 2015 at 7:30 p.m., Mitchner's cellular telephone called appellant's cellular telephone for about six minutes. Mitchner participated in the March 18, 2015 aggravated robbery.

36

those calls utilized a cellular telephone tower near the cellular telephone store where Riaz worked. Taylor stated that the data he reviewed indicated that, after the April 3, 2015 aggravated robbery, both Edwards and appellant traveled to the area near the cellular telephone store where Riaz worked.

In regard to the April 15, 2015 aggravated robbery, which was reported at about 6:35 p.m. or 6:49 p.m., Taylor testified that a telephone call was made from Edwards's cellular telephone to Williams's cellular telephone at 6:35 p.m. The call lasted about thirteen minutes. Taylor also stated that a telephone call was made from appellant's cellular telephone to Randall's cellular telephone at 6:29 p.m., and that call lasted about twenty-five minutes. After the aggravated robbery, a telephone call was made from Edwards's cellular telephone to Riaz's cellular telephone. And several "communication events" occurred between Edwards's cellular telephone and appellant's cellular telephone after the robbery. These "communication events" indicated that appellant's and Edwards's cellular telephones were in the area near Riaz's cellular telephone store after the April 15, 2015 aggravated robbery.

In regard to the May 21, 2015 aggravated robbery, which was reported at about 6:34 p.m. or 6:44 p.m., Taylor testified that a call was made from appellant's cellular telephone to Randall's cellular telephone. The call lasted about twenty minutes. Another telephone call was made from Criswell's cellular telephone to appellant's cellular telephone, and it lasted about ten minutes. Both of these

telephone calls, which occurred on May 21, 2015, utilized a cellular telephone tower near the May 21, 2015 robbery location.[22]

In regard to communications between Edwards with Riaz specifically, Taylor testified that between April 2, 2015 and April 16, 2015, multiple communications between Edwards's cellular telephone and Riaz's cellular telephone occurred. And both appellant's cellular telephone and Edwards's cellular telephone traveled to the area near Riaz's cellular telephone store on several occasions after the aggravated robberies had occurred.[23]

Finally, Taylor testified that both Edwards's cellular telephone and appellant's cellular telephone communicated with the cellular telephones of the individuals who had committed the aggravated robberies and some of those communications occurred while the robberies were in progress.

Sergeant Katrib testified that, during his investigation, he searched various individuals' cellular telephones and he found photographs and cellular telephone

---

[22]     Sergeant Katrib stated that the telephone calls on May 21, 2015 were consistent with appellant's roles in the aggravated robberies of counter-surveillance and "shot calling."

[23]     Sergeant Katrib also testified that during the course of his investigation, he found that a cellular telephone number linked to Riaz's cellular telephone store located at TX-249 and Bammel-North Houston Road was repeatedly called either just before or just after the aggravated robberies had occurred. Katrib also determined that Edwards made multiple trips to Riaz's store to sell stolen cellular telephones.

communications between appellant, Edwards, and the individuals who participated in the aggravated robberies.

On Randall's cellular telephone, Sergeant Katrib found photographs of Randall "flashing a sum of money" which were taken either on the same day that he committed an aggravated robbery or a couple days after. Randall's cellular telephone also contained recent telephone calls from appellant, including a call from appellant's cellular telephone after the aggravated robbery on May 21, 2015 committed by Randall, and during the time that law enforcement officers were searching for Randall, Duplechin-Holden, and Criswell. Additionally, Randall's cellular telephone showed telephone calls from both Duplechin-Holden's and Criswell's cellular telephones on May 21, 2015 before they committed the aggravated robbery together. Randall's cellular telephone also received a call from Edwards's cellular telephone, and the telephone numbers for appellant, Edwards, Duplechin-Holden, and Criswell were all saved in Randall's cellular telephone.

Sergeant Katrib also reviewed text messages between Randall's cellular telephone and Edwards's cellular telephone and between Randall's cellular telephone and appellant's cellular telephone. Messages from Randall's cellular telephone to appellant's cellular telephone on April 15, 2015 discussed preparations for committing a robbery that day. Other text messages between Randall's cellular telephone and appellant's cellular telephone before the May 21, 2015 aggravated

robbery indicate preparation, such as planning to secure a "tink," planning on using a "safe car" during the robbery, determining the location of the robbery, and discussing whether appellant had firearms to use in the robbery. Messages from appellant's cellular telephone request that Randall get everyone together and also state that appellant and Edwards would be going to check out a robbery target.

On Criswell's cellular telephone, Sergeant Katrib found a call log showing a telephone call from Criswell's cellular telephone to appellant's cellular telephone on May 21, 2015 as well as a telephone call between Criswell and Randall on May 21, 2015. Further, a photograph of Criswell wearing a watch that was worn by one of the individuals who had committed the April 15, 2015 aggravated robbery of the A-Wireless cellular telephone store was saved on Criswell's cellular telephone. Additionally, Criswell's cellular telephone contained photographs of him with a large amount of money being displayed.

In regard to appellant's cellular telephone, Sergeant Katrib testified that communications between appellant and Edwards were extracted from appellant's cellular telephone. For instance, on March 24, 2015, appellant's cellular telephone sent text messages to Edwards's cellular telephone stating: "Hit me wen u get up. . .we gotta go to wrk today n I think I gotta spot frfr"; "Verizon"; and "No law."[24]

---

[24]    According to Sergeant Katrib, appellant had "done his homework" and was telling Edwards about a plan to commit an aggravated robbery of a Verizon cellular telephone store that did not have any law enforcement presence. And Katrib noted

And on March 26, 2015, appellant's cellular telephone sent a text message to Edwards's cellular telephone stating: "We gotta do sum today," which Katrib testified meant that appellant was talking about committing an aggravated robbery.

Additionally, on April 3, 2015—the day of the aggravated robbery of the RadioShack electronics and cellular store—Edwards's cellular telephone sent appellant's cellular telephone a "screen shot" of Edwards's conversation with "Ali, the plug," i.e., Riaz, that discussed if certain cellular telephones were "in the box" and contained a price list for various types of cellular telephones. In the screenshot messages, Ali tells Edwards to "bring" the cellular telephones. Sergeant Katrib noted that the prices for the cellular telephones listed were a lot lower than market value for such telephones which would indicate that the cellular telephones had come from illicit activities such as aggravated robberies.

Other text messages sent from appellant's cellular telephone to Edwards's cellular telephone reference the April 15, 2015 aggravated robbery of the A-Wireless cellular telephone store. Further, on May 20, 2015, the day before the aggravated robbery of the Connectivity Source cellular telephone store, text messages from appellant's cellular telephone state: "Watz up on d tink." Sergeant Katrib testified, based on his investigation, that such messages meant that appellant was checking on

that the A-Wireless cellular telephone store, which was robbed on April 15, 2105, was a Verizon retailer.

41

the status of obtaining a stolen car to be used to commit the aggravated robbery the next day. Additional text messages from appellant's cellular telephone indicate that he had a target for the aggravated robbery. And following Randall's arrest after the May 21, 2015 aggravated robbery, a screen shot of Randall's "booking information" was texted from appellant's cellular telephone to Edwards's cellular telephone and to the cellular telephone belonging to appellant's girlfriend. In the text message to appellant's girlfriend's phone, it states, related to Randall, "I didn't even do 4aggs wit him."

Finally, Sergeant Katrib noted that appellant's cellular telephone contained text messages with a contact listed as "Nick D Plug" in appellant's phone, and the messages from appellant's cellular telephone state that appellant has "a bunch of [S]print phones" that are "[b]rand new" and "[i]n d box." And the messages ask for the prices. According to Katrib, these text messages and others, which occurred in the days before the May 21, 2015 aggravated robbery of the Connectivity Source cellular telephone store—a Sprint retailer—appear to have been setting up a sale of a large number of cellular telephones.[25]

Further, activity analytics from appellant's cellular telephone indicated that he had substantial contact with Edwards, Randall, "Nick D Plug," and two other

---

[25] Sergeant Katrib also testified that during his investigation he found "communication events" between appellant's cellular telephone and the cellular telephone of "Nick D Plug."

42

individuals connected to the house located at 102 Black Walnut Drive near a Wal-Mart store.[26] And the March 18, 2015, April 3, 2015, April 26, 2015, and May 21, 2015 aggravated robberies all had links to the house on Black Walnut Drive.

Sergeant Katrib also testified that appellant's cellular telephone contained photographs of appellant posing with "a large sum of money," including photographs from March 20, 2015—two days after the aggravated robbery of the Cellular Sales cellular telephone store—as well as photographs from April 15, 2015—the same day as the aggravated robbery of the A-Wireless cellular telephone store. Katrib noted that the photographs on appellant's cellular telephone contained $100 bills, whereas the photographs that he found on Randall's cellular telephone contained lower denominations of bills. Katrib explained that the amount that an individual received as proceeds from the commission of an aggravated robbery could be related to that individual's rank in the hierarchy—"it tends to show who was basically in charge and who was doing what they were ordered to do."

Sergeant Katrib testified that his investigation revealed that both Edwards and appellant were equally involved in the aggravated robberies. Edwards and appellant were both involved in the process of selecting the targets of the aggravated robberies, involved with providing firearms and stolen cars to be used to accomplish the

---

[26] Sergeant Katrib explained that, through his investigation, he determined that the firearms used during the aggravated robberies came from the house located at 102 Black Walnut Drive and "a lot of the planning took place at that location."

aggravated robberies, and involved in selecting and deciding the individuals who would participate in the robberies. Edwards and appellant also conducted counter-surveillance related to the aggravated robberies and gave instructions during the robberies. Further, both appellant and Edwards received proceeds from the aggravated robberies either immediately or shortly after the robberies, and they were both involved in the process of selling the cellular telephones for cash and paying the participants of the robberies.

*Appellant's Statement*

Sergeant Katrib testified that following appellant's arrest, he interviewed appellant. Appellant told Katrib that Randall, Criswell, and Williams had committed the April 3, 2015 aggravated robbery of the RadioShack electronics and cellular telephone store. Appellant also admitted that he knew that Randall had been committing aggravated robberies, and appellant acknowledged that he would ask the individuals who were committing the robberies "is your plot good." Appellant would tell them "you-all go ahead." Katrib believed that this indicated that appellant was "giving orders to the[] people to go commit aggravated robberies." Appellant also admitted to Katrib that he was present in his car[27] in the Chili's restaurant's

---

[27] Appellant's cellular telephone contained pictures of him with his car, a gold Mercedes Benz. Appellant admitted that the gold Mercedes Benz car was in fact his car.

44

parking lot on May 21, 2015 and that he had a direct line of sight to the Connectivity Source cellular telephone store during the aggravated robbery of that store.

A copy of the videotaped recording of appellant's statement was admitted into evidence at trial. And a copy of an audio recording of a telephone call during which appellant discussed the disposition of the cellular telephones that were taken during the aggravated robberies was also admitted into evidence.[28]

## Sufficiency of Evidence

In his first issue, appellant argues that the evidence is legally insufficient to support his conviction because no rational trier of fact could have found that he was part of the identifiable leadership of a criminal street gang, that the aggravated robberies were committed by a criminal street gang, or that he knowingly financed, directed, or supervised the commission of aggravated robberies by members of a criminal street gang.

In his second and third issues, appellant argues that the evidence is factually insufficient[29] to support his conviction because the evidence when viewed in a neutral light, fails to show that appellant was part of the identifiable leadership of a

---

[28] We note that the appellate record contains additional evidence presented at trial, including evidence of the items found in appellant's apartment that were consistent with someone having participated in aggravated robberies of cellular telephone stores.

[29] *See Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009); *Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996), *overruled by Brooks v. State*, 323 S.W.3d 893, 894–95, 912 (Tex. Crim. App. 2010) (plurality opinion).

45

criminal street gang, that the aggravated robberies were committed by a criminal street gang, or that appellant knowingly financed, directed, or supervised the commission of aggravated robberies by members of a criminal street gang. Appellant further asserts that he has the right to a factual sufficiency review under the Texas Constitution[30] and this Court's failure to conduct a proper factual sufficiency review denies him due process of law and equal protection.[31]

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We defer to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. That said, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

---

[30]    *See* TEX. CONST. art. V, § 6(a).

[31]    *See* U.S. CONST. amends. V, XIV; TEX. CONST. art. 1, § 19.

In reviewing the legal sufficiency of the evidence, a court must consider both direct and circumstantial evidence, and any reasonable inferences that may be drawn from the evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) (evidence-sufficiency standard of review same for both direct and circumstantial evidence). Circumstantial evidence is just as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). For evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with a defendant's guilt. *See Wise*, 364 S.W.3d at 903; *see also Cantu v. State*, 395 S.W.3d 202, 207–08 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). Rather, a court considers only whether the inferences necessary to establish guilt are reasonable based on the cumulative force of all the evidence when considered in the light most favorable to the jury's verdict. *Wise*, 364 S.W.3d at 903; *Hooper,* 214 S.W.3d at 13.

As previously noted, appellant asserts that the evidence is both legally and factually insufficient to support his conviction for the offense of directing activities of a criminal street gang. However, this Court now reviews the factual sufficiency of the evidence under the same appellate standard of review as that for legal sufficiency. *See Edwards v. State*, 497 S.W.3d 147, 156–57 (Tex. App.—Houston

[1st Dist.] 2016, pet. ref'd); *Ervin v. State*, 331 S.W.3d 49, 52–56 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). As the Court of Criminal Appeals has stated: "[T]he *Jackson . . .* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality opinion); *see also Payne v. State*, No. 01-16-00821-CR, 2017 WL 5503650, at *2 (Tex. App.—Houston [1st Dist.] Nov. 16, 2017, no pet.) (mem. op., not designated for publication). Thus, we disregard appellant's argument that the evidence is factually insufficient to support his conviction and focus solely on whether the evidence is legally sufficient to support appellant's conviction. *See Payne*, 2017 WL 5503650, at *2; *see also Alvarado v. State*, No. 01-14-00894-CR, 2016 WL 7694355, at *5 (Tex. App.—Houston [1st Dist.] Dec. 22, 2016, no pet.) (mem. op., not designated for publication) (Court of Criminal Appeals "abolished factual-sufficiency review of issues on which the State b[ears] the burden of proof at trial"). In doing so, we note that this Court has previously rejected constitutional challenges, such as those made by appellant, to the use of the *Jackson* legal sufficiency standard when we are conducting a factual sufficiency review. *See Edwards*, 497 S.W.3d at 156–57; *Kiffe v. State*, 361 S.W.3d 104, 109–10 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Rivera v. State*, No.

48

01-17-00351-CR, 2018 WL 3352990, at \*4 (Tex. App.—Houston [1st Dist.] July 10, 2018, no pet.) (mem. op.); *Tan v. State*, No. 01-15-00511-CR, 2016 WL 3542255, at \*3 (Tex. App.—Houston [1st Dist.] June 28, 2016, pet. ref'd) (mem. op., not designated for publication).

A person commits the offense of directing activities of a criminal street gang "if the person, as part of the identifiable leadership of a criminal street gang, knowingly finances, directs, or supervises the commission of, or a conspiracy to commit, . . . by members of a criminal street gang . . . a felony offense that is listed in Article 42A.054(a), Code of Criminal Procedure." TEX. PENAL CODE ANN. § 71.023(a)(1); *see also Edwards v. State*, No. 14-17-00460-CR, 2019 WL 2426710, at \*13 (Tex. App.—Houston [14th Dist.] June 11, 2019, pet. ref'd) (mem. op., not designated for publication). "[A] felony offense . . . listed in Article 42A.054(a), Code of Criminal Procedure" includes the felony offense of aggravated robbery. *See* TEX. CODE CRIM. PROC. ANN. art. 42A.054(a)(11); TEX. PENAL CODE ANN. § 71.023(a)(1); *see also Edwards*, 2019 WL 2426710, at \*13. A "[c]riminal street gang" means "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." TEX. PENAL CODE ANN. § 71.01(d) (internal quotations omitted); *see also Edwards*, 2019 WL 2426710, at \*13.

Here, appellant asserts that no rational trier of fact could have found that (1) he was part of the identifiable leadership of a criminal street gang; (2) the aggravated robberies were committed by a criminal street gang; or (3) he knowingly financed, directed, or supervised the commission of aggravated robberies by members of a criminal street gang.

As the evidence set forth above demonstrates, the five aggravated robberies of cellular telephone stores between March 18, 2015 and May 21, 2015 reflect a similar scheme or plan. *See Edwards*, 2019 WL 2426710, at *13. And although the aggravated robberies were not all committed by the same individuals, there was significant overlap in the participants in the robberies as illustrated below:

| March 18, 2015 | April 3, 2015 | April 15, 2015 | April 26, 2015 | May 21, 2015 |
|---|---|---|---|---|
| Hill<br>Mitchner<br>Williams | Hill<br>Williams<br>Randall<br>Criswell | Williams<br>Randall<br>Criswell | Mitchner<br>Williams<br>Hawkins<br>Philpot | Randall<br>Criswell<br>Duplechin-Holden |

Williams was involved in four of the aggravated robberies; Randall was involved in three of the aggravated robberies; Criswell was involved in three of the aggravated robberies; Hill was involved in two of the aggravated robberies; Mitchner was involved in two of the aggravated robberies; and Philpot, Hawkins, and Duplechin-Holden were each involved in one of the aggravated robberies. *See* TEX. PENAL CODE ANN. § 71.01(d).

50

Additionally, the evidence shows that appellant was one of two leaders that financed, directed, or supervised the five aggravated robberies involving Williams, Randall, Criswell, Hill, Mitchner, Philpot, Hawkins, and Duplechin-Holden. *See Edwards*, 2019 WL 2426710, at \*13; *see also* TEX. PENAL CODE ANN. §§ 71.01(d) (defining "[c]riminal street gang" as "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities" (internal quotations omitted)), 71.023(a)(1). Appellant chose locations for the aggravated robberies, assigned individuals certain tasks to be performed related to the aggravated robberies, instructed the individuals on how to commit the aggravated robberies, conducted counter-surveillance both before and during the aggravated robberies, drove to the robbery locations with the robbery participants following behind to show them where the robberies were to be committed, was present during the aggravated robberies and acted as a lookout, maintained contact with and communicated with the robbery participants before, during, and after the aggravated robberies, followed the robbery participants away from the robbery location after the robbery was complete, received the cellular telephones and devices taken during the aggravated robberies, participated in the selling of the cellular telephones and devices taken during the aggravated robberies, and paid the robbery participants for

51

their roles in the aggravated robberies. *See Edwards*, 2019 WL 2426710, at \*13; *see also* TEX. PENAL CODE ANN. § 71.023(a)(1).

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have determined beyond a reasonable doubt that appellant was part of the identifiable leadership of a criminal street gang, the aggravated robberies were committed by a criminal street gang, and he knowingly financed, directed, or supervised the commission of aggravated robberies by members of a criminal street gang. *See* TEX. PENAL CODE ANN. §§ 71.01(d), 71.023(a)(1); *see also Edwards*, 2019 WL 2426710, at \*13–14. Thus, we hold that the evidence is legally sufficient to support appellant's conviction for the offense of directing activities of a criminal street gang.

We overrule appellant's first, second, and third issues.

### Jury Charge Error

In his fourth issue, appellant argues that the trial court erred in instructing the jury, over his objection, on the law of parties[32] because it does not apply to the offense of directing activities of a criminal street gang.

We review complaints of jury-charge error under a two-step process. *See Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2004); *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994). First, we must determine whether

---

[32] *See* TEX. PENAL CODE ANN. § 7.01 ("Parties to Offense").

error exists in the trial court's charge. *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013). Second, if there is error, the court must determine whether the error caused sufficient harm to require reversal of the conviction. *Id.* If the defendant preserved error by timely objecting to the charge, an appellate court will reverse if the defendant demonstrates that he suffered some harm as a result of the error. *Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009).

Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a). A person is "criminally responsible for an offense committed by the conduct of another if[,] . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2); *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012). "In general, an instruction on the law of parties may be given to the jury whenever there is sufficient evidence to support a jury verdict that the defendant is criminally responsible under the law of parties." *Ladd v. State*, 3 S.W.3d 547, 564 (Tex. Crim. App. 1999); *see also Saavedra v. State*, No. 01-17-00295-CR, 2018 WL 3581081, at *6 (Tex. App.—Houston [1st Dist.] July 26, 2018, pet. ref'd) (mem. op., not designated for publication).

Here, the trial court instructed the jury as follows:

> All persons are parties to an offense who are guilty of acting together in the commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

> A person is criminally responsible for an offense committed by the conduct of another, if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

> . . . .

> If you find from the evidence beyond a reasonable doubt that in Harris County, Texas, Terrence Devaughn Edwards, heretofore on or about [the] 30th day of June, 2014 continuing through the 18th day of June, 2015, did then and there unlawfully, as part of the identifiable leadership of a criminal street gang, knowingly finance, direct, or supervise the commission of the offense of aggravated robbery by members of said criminal street gang, and that [appellant], with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Terrence Devaughn Edwards to commit the offense, if he did, then you will find [appellant] guilty of directing the activities of a criminal street gang, as charged in the indictment.

Appellant argues that the trial court erred in instructing the jury on the law of parties because under Texas Penal Code section 71.023(a) "a gang member can be criminally liable for directing an organized criminal street gang only as a principal," applying the law of parties to the offense of directing activities of a criminal street gang "leads to an absurd result" and "permits conviction on less evidence than the statute requires," and the trial court's charge to the jury permitted the jury to convict

54

appellant of the offense of directing activities of a criminal street gang "without proof beyond a reasonable doubt of [a] defining element of the offense—that [a]ppellant was part of the identifiable leadership." (Emphasis omitted.)

For purposes of this opinion we will presume, without deciding, that the trial court erred in instructing the jury on the law of parties. *See Edwards*, 2019 WL 2426710, at \*16. Because appellant did object to the trial court's inclusion of the law-of-parties instruction in its charge, we will reverse appellant's conviction if appellant demonstrates that he suffered "some harm." *Sakil*, 287 S.W.3d at 25–26; *see also Johnson v. State*, No. 01-17-00570-CR, 2018 WL 1630178, at \*5 (Tex. App.—Houston [1st Dist.] Apr. 5, 2018, no pet.) (mem. op., not designated for publication) ("[I]f jury-charge error does exist, we review the record to determine whether the error caused sufficient harm to require reversal.").

Here, the trial court's charge authorized the jury to find appellant guilty of the offense of directing activities of a criminal street gang as either a principal or as a party. *See* TEX. PENAL CODE ANN. §§ 7.01(a), 7.02(a)(2); *Edwards*, 2019 WL 2426710, at \*16. And as previously addressed, sufficient evidence supports appellant's guilt as a principal actor for the offense of directing activities of a criminal street gang. *See Edwards*, 2019 WL 2426710, at \*16. The Court of Criminal Appeals has stated that "[w]here the evidence clearly supports a defendant's guilt as a principal actor, any error in the trial court in charging [the jury]

55

on the law of parties is harmless." *Black v. State*, 723 S.W.2d 674, 675 (Tex. Crim. App. 1986); *see also Edwards*, 2019 WL 2426710, at *16; *Saavedra*, 2018 WL 3581081, at *6; *Nelson v. State*, 405 S.W.3d 113, 126 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd).

Thus, having held that the evidence is legally sufficient to support appellant's conviction as a principal actor for the offense of directing activities of a criminal street gang, we hold that appellant was not harmed by the trial court's purportedly erroneous instruction to the jury on the law of parties. *See Nelson*, 405 S.W.3d at 126; *see also Edwards*, 2019 WL 2426710, at *16 (where evidence sufficient to support defendant's conviction as principal actor for offense of directing activities of criminal street gang, defendant did not suffer egregious harm from any error in instructing jury on law of parties).

We overrule appellant's fourth issue.

## Modification of Judgment

In his fifth issue, appellant argues that the trial court's judgment should be modified to remove the trial court's "affirmative finding that [a]ppellant used or exhibited a deadly weapon" because the jury did not make an affirmative finding to that effect and the trial court had no authority to include such a finding in its judgment. The State concedes in its brief that "[a]ppellant's position on this issue appears to have some merit," but it notes that "[t]he removal of the deadly weapon

finding from the [trial court's] judgment should not have any other effect on the case."

Related to a deadly-weapon finding, on page 2 of the trial court's judgment under the "special findings" section, it states:

> The court finds defendant used or exhibited a deadly weapon, namely, a firearm, during the commission of a felony offense or during immediate flight therefrom or was a party to the offense and knew that a deadly weapon would be used or exhibited. Tex. Code Crim. Proc. art. 42A.054(B)(2); Tex. Penal Code sec. 1.07(17)(A)(B).

An appellate court should not look at the facts of a case to determine if an affirmative deadly-weapon finding is properly included in a trial court's written judgment. *See Polk v. State*, 693 S.W.2d 391, 396 (Tex. Crim. App. 1985); *Rachel v. State*, Nos. 02-18-00500-CR, 02-18-00501-CR, 2019 WL 5996985, at *7 (Tex. App.—Fort Worth Nov. 14, 2019, pet. ref'd) (mem. op., not designated for publication). Instead, the court must look to the charging instrument, the jury charge, and the jury verdict to evaluate the propriety of a deadly-weapon finding in the trial court's judgment. *See Polk*, 693 S.W.2d at 396; *Rachel*, 2019 WL 5996985, at *7. As the Court of Criminal Appeals has explained, when the jury is the trier of fact, the trial court may not properly enter an affirmative finding concerning a defendant's use or exhibition of a deadly weapon or firearm during the commission of the offense unless:

1. the indictment specifically alleged that a deadly weapon was used (using the words "deadly weapon") and the defendant was found guilty "as charged in the indictment";

2. the indictment did not use the words "deadly weapon" but alleged use of a deadly weapon per se (such as a firearm); or

3. the jury made an express affirmative finding of fact of use of a deadly weapon in response to the submission of a special issue during the punishment phase of trial.

*See Polk*, 693 S.W.2d at 396; *see also Duran v. State*, 492 S.W.3d 741, 746 (Tex. Crim. App. 2016); *Edwards*, 2019 WL 2426710, at *17.

Here, the indictment did not use the words "deadly weapon" or allege the use of a deadly weapon per se. *See Edwards*, 2019 WL 2426710, at *17. And a special issue on the use of a deadly weapon was not submitted to the jury or decided by the jury. *See id.*

"[A]ppellate court[s] ha[ve] the power to correct and reform a trial court judgment 'to make the record speak the truth when [they] ha[ve] the necessary data and information to do so, or make any appropriate order as the law and nature of the case may require.'" *Nolan v. State*, 39 S.W.3d 697, 698 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (quoting *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd)); TEX. R. APP. P. 43.2(b). This power includes the power to delete a deadly-weapon finding that was erroneously entered in the trial court's written judgment. *Cobb v. State*, 95 S.W.3d 664, 668 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *see also Garcia v. State*, No. 01-15-00030-CR, 2016 WL

58

7011411, at *11–12 (Tex. App.—Houston [1st Dist.] Dec. 1, 2016, pet. ref'd) (mem. op., not designated for publication).

Thus, we modify page 2 of the trial court's judgment to delete the following from the "special findings" section:

> The court finds defendant used or exhibited a deadly weapon, namely, a firearm, during the commission of a felony offense or during immediate flight therefrom or was a party to the offense and knew that a deadly weapon would be used or exhibited.  Tex. Code Crim. Proc. art. 42A.054(B)(2); Tex. Penal Code sec. 1.07(17)(A)(B).

*See Duran*, 492 S.W.3d at 750 (modifying trial court's judgment to delete improperly entered deadly-weapon finding); *Rachal*, 2019 WL 5996985, at *7; *Edwards*, 2019 WL 2426710, at *17; *Garcia*, 2016 WL 7011411, at *11–12.

We sustain appellant's fifth issue.

## Conclusion

We affirm the judgment of the trial court as modified.


Julie Countiss
Justice

Panel consists of Chief Justice Radack and Justices Lloyd and Countiss.

Countiss, J., concurring.

Publish.  TEX. R. APP. P. 47.2(b).